# <u>EXHIBIT A</u>
## *(Affidavit of Dr. Raj Miniyar)*

<u>**AFFIDAVIT OF DR. RAJ MINIYAR**</u>

My name is Raj Miniyar. I am a board-certified pediatric medicine physician licensed in the State of Georgia with over 20 years of experience. I am the owner of Dr. Miniyar's Pediatrics, P.C. I am over 19 years of age and have personal knowledge of the facts and matters contained in this affidavit. I understand it is being used in support of a Motion for Relief from the Automatic Stay in the bankruptcy case of Kyle Mitchell and Corie Mitchell, Case No. 25-40081-JJR13, in the United States Bankruptcy Court for the Northern District of Alabama.

In 2008, I founded Dr Minyar's Pediatrics, P.C. with four locations in Georgia: Rome, Cartersville, Cedartown, and Trion. I oversee all operations of those locations, which includes supervision of over ten board-certified health care providers.

One of the health care providers under my supervision is Corie Mitchell, a Family Nurse Practitioner. Mrs. Mitchell became employed with Dr. Miniyar's Pediatrics on September 13, 2023 by virtue of a written Employment Agreement, a copy of which is attached to my Affidavit as Exhibit 1. Paragraph number 1 of that Exhibit (Employment Agreement) provides:

> 1. <u>**RELATIONSHIP OF THE PARTIES**</u>. Subject to all of the terms and conditions of this Agreement, including, without limitation, the credentialing procedures and the licensing requirements, Practice hereby employs Provider and Provider hereby accepts employment with Practice upon the terms and conditions of this Agreement and subject to Practice's bylaws and the rules practices policies, and procedures established from time to time by Dr Raj Miniyar, the Practice's president ("President").

Paragraph number 7(b)(ii) further provides:

> 7.(b) <u>**Termination by Practice with Cause**</u>. Practice shall have the right to terminate this Agreement and discharge Provider with cause, at any time. . . . "[W]ith cause" shall mean:
>
> ii. <u>**Misconduct by Provider**</u>: Conduct by Provider that amounts to fraud, dishonesty, . . . gross negligence, insolence, insubordination, or willful misconduct in the performance of the duties hereunder, or in Provider's relationship with Practice, its employees, or patients;

Paragraph number 7(b)(xii) further provides:

1

xii. **Negative Work Habits**. . . . . [P]oor productivity on the behalf of Provider and subversive behavior (but only after written notice is given to Provider of any such failure and Provider is given a reasonable opportunity to cure such failures (not to exceed fifteen days);

I have attached to this Affidavit, as Exhibit 2, a statement from Michelle Piazza, a Certified Clinical Medical Assistant employed at Dr. Miniyar's Pediatrics in Trion, Georgia; a Supervisor Statement from Veronica Ortiz as Exhibit 3; and, a Parent Statement signed by Mercedes Miller regarding a July 29, 2025 office visit by Phoebe Miller, the daughter of Mercedes Miller, as Exhibit 4.

All of these exhibits are true, correct, and genuine copies of business records of Dr. Miniyar's Pediatrics kept in the ordinary course of business and kept under my care, custody, and control.

Exhibits 2 – 4 illustrate the on-going misconduct and negative work habits of Corie Mitchell. Despite our repeated attempts to modify and correct Mrs. Mitchell's behavior over the past three months, Mrs. Mitchell's conduct has continued to decline. The conduct referenced in Exhibits 2-4 evidences her dishonesty, negligence, insubordination, and willful misconduct in the performance of her duties with my practice and in her relationships with the Practice's employees and patients.

As stated in Exhibit 1, Employment Agreement, at number 7(a)(ii)b:

7. **TERM AND TERMINATION OF EMPLOYMENT**. The term of employment under this Agreement shall commence as stated above in Section 2, and shall continue for four years Period, unless terminated sooner during that four year period as follows:

(a)(ii)b Sincerity, honesty & integrity about the employment contract term & termination without cause notice requirement: Provider understands that honesty and integrity are important cornerstone principles of this agreement. Provider pledges to adhere to these principles and assures the practice that the provider is sincere and honest about fulfilling the employment contract term and termination without cause notice requirements and guarantees to honor them. Provider acknowledges that the practice has explained up front the importance of fulfilling

2

the entire contract term extensively and discussed how crucial this particular clause is. Provider understands that the process of recruiting a new provider and ensuring a new provider is fully credentialed with all major insurance companies takes approximately twelve months minimum. Provider acknowledges that failure to complete the minimum four full years of employment term . . . will result in substantial liquidated damages to the practice and the provider will be responsible to pay to the practice such liquidated damages. . . . . Provider acknowledges failure to complete the minimum four full years of employment term. . . will hurt legitimate business interest of the practice including but not limited to: . . . loss of revenue, shortage of available provider staff, decrease in the patient volume, extra stress on other providers and general staff, adverse effect on patient satisfaction & practice's reputation adverse effect on staff's morale, financial loss due to continuation of practice's fixed overhead expenses. . . . If the provider does not complete the four year term of the employment for any reason including but not limited to with cause termination by the practice. . .the liquidated damages will be equal to 40% of the total monetary value of the compensation and benefits received by the providers in the preceding 12 months from the last day of the employment . . . . This percentage amount of total compensation and benefit which is used to calculate the liquidated damages will go down by 5% for every full employment year completed by the provider. (40% year one, 35% year two, 30% year three and 25% of year four). . . . Each of the parties hereto agrees that this payment constitutes liquidated damages and is not a penalty, and is a reasonable estimate of the damages to be suffered by the Practice. Provider has participated in the negotiations of, and has read and considered, . . . and agrees that such liquidated damages provisions are fair, reasonable and reasonably necessary for the protection of one or more legitimate interests of the Practice.

On or around July 31, 2025, Debtor notified the Practice that she intended to resign, effective October 29, 2025, citing a 90-day notice period detailed in the Employment Agreement. However, Mrs. Mitchell's conduct is causing great harm to the Practice's reputation in the community, and I am requesting a Court Order permitting the Practice to terminate Mrs. Mitchell's employment immediately pursuant to the written terms of her Employment Agreement.

I have read the contents of this Affidavit and swear or affirm that the information contained herein is true and correct.

Further Affiant sayeth not.

Dr. Raj Miniyar

3

**STATE OF GEORGIA** )
)
**COUNTY OF** Bartow. )

 I, the undersigned Notary Public, in and for said County and State, hereby certify that Dr. Raj Miniyar, whose name is signed to the foregoing instrument, and who is known to me, who duly sworn, acknowledged before me on this day that, the statements contained herein are true and correct and he executed the same voluntarily on the day the same bears date.

 Given under my hand and Official Seal on this the 14 day of August , 2025.

_Jenna Hester._

(SEAL)

**NOTARY PUBLIC**

Commission Expires: 11/18/2025.

4

4593110.1



# Exhibit 1 to the Affidavit of Dr. Raj Miniyar

## *(Employment Agreement)*

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made as of the 13 th day of SEPTEMBER , 2023, by and between DR. MINIYAR'S PEDIATRICS, P.C. (hereinafter referred to as the "Practice"), a professional corporation organized and existing under the laws of the State of Georgia, and  CORIE SHELBY MITCHELL- FNP,  a board certified Nurse Practitioner in the State of Georgia (hereinafter referred to as the "Provider").

In consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Practice and Provider do hereby agree as follows:

1. <u>RELATIONSHIP OF THE PARTIES</u>.  Subject to all of the terms and conditions of this Agreement, including, without limitation, the credentialing procedures and the licensing requirements, Practice hereby employs Provider and Provider hereby accepts employment with Practice upon the terms and conditions of this Agreement and subject to Practice's by-laws and the rules, practices, policies, and procedures as established from time to time by Dr. Raj Miniyar, the Practice's president ("President").

2. <u>EFFECTIVE DATE AND TERM</u>.

(a) <u>Effective Date of Agreement and Employment</u>. This Agreement is effective as of the date the last party hereto signs the Agreement. The effective date of Provider's employment with the Practice and the date at which Provider's entitlement to compensation shall commence ("Employment Date") shall be OCTOBER 03, 2023, TUESDAY

(b) <u>Initial Term</u>. Unless terminated earlier as provided herein in clause 7, the term of employment under this agreement shall be for four years. At the expiration of the Initial term, this Agreement shall automatically renew on a two (2) year-to-two (2) year basis ("Renewal Term"), unless terminated by either party in writing .

3. <u>DUTIES</u>.  Provider shall:

(a) Render, to the very best of Provider's ability, on behalf of the Practice, professional services to and for such persons as are accepted as patients by the Practice, and serve in such office or capacities as may be determined by the Practice, carrying out such reasonable duties and assignments in accordance with policies and directives of the Practice as may from time to time be established;

(b) <u>Devote</u> Provider's time, energy and skill to the performance of the professional services in which the Practice is engaged, at such place or places and on such days as well as the hours during the day as the Practice may direct, in the Practice's best interests, and in strict accordance with the professional standards of the Practice from time to time established.  Provider shall not provide services as a provider on Provider's own behalf or on behalf of any other person or entity or accept any other type of employment or work as an independent contractor or have any other type of full-time or part-time employment or engage in a business of any kind  as long as this Agreement is in force and effect, without the express prior written consent of the President.

(c) Perform Provider's services for the Practice in a competent and capable manner and in accordance with the standard of care. Provider's services include but are not limited to: Evaluating, diagnosing and treating patients; referring patients to outside facilities/specialists as needed. Ordering labs, radiological tests and investigations as needed. Answering patients' medical questions over the phone. Supervising, supporting, and guiding other clinical staff such as, RNs, LPNs, CMAs, NPs , PAs and CNAs. Reviewing faxes, lab results, radiology results, specialist reports and letters, hospital patient notes, ER visit notes, and discharge summaries on the same day they are received, before leaving the Practice; signing and dating them and taking prompt professional action on them. Ordering medication refills as per the Practice's policies. Completing each patient's medical records on the same day the patient is seen, before leaving the Practice. Following up on the labs, radiological tests, other investigations, and specialist referrals ordered by Provider in accordance with the Practice's policy set by the President.

(d) Be on call for the Practice as per the on-call schedule provided by the Practice.

(e) Fulfill the following work schedule requirements: Five weekdays (Monday through Friday) as follows plus one Saturdays per month as follows:

    i. Monday through Thursday : Office appointments begin at 9:00 a.m. The last appointment will be scheduled at 6:00 p.m. No appointments will be scheduled between 12:00 p.m. to 1:30 p.m.

    ii. Every Friday: Office appointments begin at 9:00 a.m. The last appointment will be scheduled at 1:00 p.m.

    iii. One Saturdays per month: 9:00 a.m. until 1:00 p.m.

4. <u>COMPENSATION</u>.

(a) <u>Base Salary</u>. Provider shall have a base salary of **$95,000.00 (NINETY FIVE THOUSAND US DOLLARS)** per annum, payable bi-weekly.

(b) <u>Productivity</u>: <u>Productivity</u>: If the provider sees more than 500 patients in the given month , then provider will **EARN $20 BONUS FOR EACH OF THE EXTRA PATIENTS SEEN** on the top of baseline 500 patients in the given month.

(c) <u>Group/Team Productivity Bonus</u>. Provider will be also eligible for the Group/Team Productivity Bonus. The goals, rules and guidelines to meet this bonus criteria will be solely set by the President from time to time at his sole and absolute discretion.

(d) <u>No Ownership Interest</u>. Provider hereby expressly agrees and covenants that the compensation and benefits received by Provider under this Agreement shall satisfy and discharge in full all claims against Practice for compensation in regard to Provider's professional services. Provider acknowledges that this Agreement in no way confers upon Provider any ownership interest in or personal claim upon any fees charged by Practice for Provider's services, whether the same are collected during the term of this Agreement or after the termination thereof, and Provider hereby disclaims and renounces any such interest or claim. All accounts receivable generated by Provider for professional services rendered by Provider to patients during the term of this Contract, and all fees or income received for medical professional services rendered by Provider to patients, all

2

salaries for medical professional employment, and payments made to Provider under contracts for medical professional services, including, without limitation, witness fees, deposition fees, report fees, government incentive payments, EHR meaningful use incentives, HEDIS incentives , PCMH- NCQA incentives, other pay for performance incentives, insurance incentives, or other incentive awards from third party payors, etc., shall be the property of the Practice, and Provider shall have no claim against the Practice for the same.

    5. <u>ADDITIONAL BENEFITS</u>. In addition to the compensation provided by Section 4 hereof, Provider shall be entitled to the following benefits during the term of this Agreement:

    (a) <u>401(k) plan</u>. Provider may participate in such pension and profit-sharing plans as are offered by the Practice, if any, and Provider may participate in any other deferred income plans offered by the Practice, subject to the terms and conditions of such plans. Currently, the Practice offers a 401(k) plan in which employees may enroll after completion of twelve months of employment pursuant to the requirements of the plan sponsor.

    (b) <u>Paid Personal Time Off</u> . Provider shall be entitled to a total of two weeks (10 full workdays) paid personal time off per year. This personal time off includes vacation, sick time off, meetings, conferences, inclement weather, vehicle problems and other personal time off for any reason. Any time off should be requested in advance by Provider and must be approved by the Practice to avoid any potential scheduling conflicts. The provider is also expected to avoid taking time off during the busy sick season (October 01 to march 31). Any time taken off above and beyond the paid personal time off and the paid holiday time set forth in this subsection and subsection (c) below, shall be unpaid. The unpaid time off time will be deducted from Provider's next paycheck on a pro rata basis. Once Provider turns in a written notice for the termination of employment, Provider is not eligible for any paid time off even if it was already approved and/or Provider has unused paid time off left. The unused paid time off may not be rolled over to the next employment year. Provider will be eligible for PTO from the day one of the employment.

    (c) <u>Holidays</u>. Provider shall be entitled to six paid holidays per year to include: 1) New Year's Day, 2) Christmas, 3) Thanksgiving, 4) 4th of July, 5) Labor Day and 6) Memorial Day. The practice observes these holidays on the actual calendar dates they fall, irrespective of the day of the week.

    (d) <u>Professional Liability Insurance</u>. The Practice will pay 100% of annual claims made malpractice premiums covering Provider for coverage of limits of $1 million per incident/$3 million aggregate per year, or as long as there are no malpractice claims against Provider. At the termination of the employment, provider is required to inform to professional liability insurance company in writing the termination date with in 24 hours and instruct the insurance company to return the unused premium credit to the practice. Provider agrees to do so.

    (e) <u>Fees.</u>
     i. The Practice will pay 100% of Provider's Georgia State providers professional license fee, if any.

     ii. The Practice will pay 100% of Provider's Georgia State Treatment protocol fee, if any.

3

iii. CME:The Practice will pay 100% of actual expenses incurred for the ANNUAL SUBSCRIPTION OF UP TO DATE.

iv. The Practice will pay 100% of the annual and incidental fees related to use of Electronic Medical Records Software (MacPractice).

v. The Practice will pay 100% of the annual and incidental fees related to use of online, electronic prescription access for non-controlled medications.

**(F) SIGNING BONUS: $ 2000 SIGNING BONUS** will be given to the provider on the Employment Date. The provider categorically accepts and agrees that the provider will pay the entire amount of $2000 back to the practice, no later than 30 days before the last date of employment, if the provider leaves the practice for any reason what so ever, with or without cause, before the four years contract term and the commitment for the full time employment is over.

**(G) ANNUAL RAISE:** The provider will receive raise as follows : a) $2000 when the second employment year starts b) $2000when the third employment year starts c) $2000 when the forth employment year starts. Provider should inform the anticipated raise date, 2 weeks prior, to the payroll department.

**(H) MEDICAL SPANISH SKILLS INCENTIVE:** At the end of the first employment year, if provider has mastered skills of speaking medical Spanish sufficient enough to be able to see Spanish speaking patient independently, without help of an interpreter , one time $2500 bonus will be awarded to the provider.

6. ADDITIONAL COVENANTS. The Practice and Provider mutually agree, during the term of this Agreement, that:

(a) Direction of Duties. The Practice shall have the sole and exclusive right to direct and control the assignment of the patients of the Practice to Provider. This determination shall be made solely by the Practice in accordance with the best interests of each patient and the Practice. Provider expressly acknowledges that all patients are patients of the Practice and not patients of Provider. Provider agrees to accept such patients as are assigned to Provider by the Practice and recognizes that the patients treated by Provider may subsequently be assigned by the Practice to other professional providers employed by the Practice.

(b) Assignment to Locations. Provider's assignment to the Practice's different locations will be solely and exclusively directed and controlled the Practice. This determination shall be made solely by Practice in accordance with the best interests of each patient and Practice.

(c) Records and Information. Any and all medical records or other information generated by Provider in pursuance of Provider's duties hereunder are and shall remain the property of the Practice. Provider shall not remove, copy, or disseminate said records or other information under any circumstances without the Practice's advance express written consent.

(d) Limitation on Provider's Authority. Provider shall not have authority to enter into any contracts binding upon the Practice, or to create any obligations on the part of the Practice. Provider shall not have the authority or permission to speak to any member of the media or to make any other public statement of any kind on behalf of the Practice without the Practice's advance express written consent.

4

(e) HIPAA Requirements. Provider agrees to comply with the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. §1320d ("HIPAA") and any current and future regulations promulgated thereunder, including, without limitation, the federal privacy regulations contained in 45 C.F.R. Parts 160 and 164 ("Federal Privacy Regulations"), the federal security standards contained in 45 C.F.R. Parts 160, 162 and 164 ("Federal Security Regulations"), and the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162 (the "Federal Electronic Transaction Regulations"), all as amended from time to time and all collectively referred to herein as "HIPAA Requirements." Provider agrees not to use or further disclose any Protected Health Information (as defined in the Federal Privacy Regulations) or EPHI (as defined in the Federal Security Regulations), other than as permitted by the HIPAA Requirements and the terms of this Agreement. In addition, Provider agrees to comply with any state laws and regulations that govern or pertain to the confidentiality, privacy, security of, and electronic and transaction code sets pertaining to, health care information.

(f) Timely Completion of Duties. Provider accepts and agrees that providing medical care to patients and making important medical decisions is a time-sensitive process. Hence, Provider will not leave the place of employment each shift until Provider completes the duties assigned to Provider for the given day as stated in Section 3.

(g) CMS Coding. Provider acknowledges the legal and ethical duty to follow the correct medical coding guidelines set by Center for Medicaid and Medicare services (CMS). Provider will be accountable for the result of inaccurate coding. Provider agrees that Provider will follow coding guidelines honestly and accurately.

(h) Primary Residence: Provider is required to have primary residence within the city limits of Rome, Ga. though out their employment period.

7. TERM AND TERMINATION OF EMPLOYMENT. The term of employment under this Agreement shall commence as stated above in Section 2, and shall continue for four years Period, unless terminated sooner during that four year period as follows:

(a) Termination by Provider.

    i. With Cause. Provider shall have the right to terminate this Agreement with cause upon ninety (90) days written notice to Practice if this Agreement is breached by the Practice and the breach remains uncured for a period of thirty (30) days after written notice of the breach is delivered by Provider to the President. In any written notice of breach, Provider is responsible to provide clear, comprehensive, and objective proof that the Practice has indeed breached the Agreement.

    ii. Without Cause. Provider shall have the right to terminate this Agreement without cause upon one hundred and twenty (120) days written notice to Practice. Provider understands and explicitly acknowledges that in connection with any such termination:

        a) Termination without cause includes termination for any reason other than Practice's breach of this Agreement, including but not limited to Provider's

5

dissatisfaction with employment or unspecified personal or family reasons of any type and nature.

b) Sincerity, honesty & integrity about the employment contract term & termination without cause notice requirement: Provider understands that honesty and integrity are important cornerstone principles of this agreement. Provider pledges to adhere to these principles and assures the practice that the provider is sincere and honest about fulfilling the employment contract term and termination without cause notice requirements and guarantees to honor them. Provider acknowledges that the practice has explained upfront the importance of fulfilling the entire contract term extensively and discussed how crucial this particular clause is. Provider understands that the process of recruiting a new provider and ensuring a new provider is fully credentialed with all major insurance companies takes approximately twelve months minimum. Provider acknowledges that failure to complete the minimum four full years of employment term and/or failure to give the minimum one hundred and twenty (120) days' notice for the termination of employment without cause will result in substantial liquidated damages to the practice and the provider will be responsible to pay to the practice such liquidated damages. Provider acknowledges that these damages are difficult to pre-estimate. Provider acknowledges failure to complete the minimum four full years of employment term and/or failure to give the minimum one hundred and twenty (120) days' notice for the termination of employment without cause will hurt legitimate business interests of the practice including but not limited to: shortage of available patient appointment slots, loss of revenue, shortage of available provider staff, decrease in the patient volume, extra stress on other providers and general staff, adverse effect on patient satisfaction & practice's reputation, adverse effect on staff's morale, financial loss due to continuation of practice's fixed overhead expenses even after provider untimely stops performing duties. If provider fails to give minimum hundred and twenty (120) days' notice, then the liquidated damages will be equal to a total of four months of provider's average monthly production amount in the past 12 months preceding the last day of the employment. If the provider does not complete the four year term of the employment for any reason including but not limited to with cause termination by the practice and without cause termination by the provider, the liquidated damages will be equal to 40% of the total monetary value of the compensation and benefits received by the providers in the preceding 12 months from the last day of the employment , plus total recruitment expense spent by the practice to hire the provider. This percentage amount of total compensation and benefit which is used to calculate the liquidated damages will go down by 5% for every full employment year completed by the provider. ( 40% year one, 35% year two, 30% year three and 25% of year four). If provider breaches both, 120 days' notice requirement and four years term commitment, then the provider will be responsible for both type of liquidated damages as mentioned above and not just one type of liquidated damages. Each of the parties hereto agrees that this payment constitutes liquidated damages and is not a penalty, and is a reasonable estimate of the damages to be suffered by the Practice. Provider has

participated in the negotiations of, and has read and considered, the foregoing liquidated damages provisions and agrees that such liquidated damages provisions are fair, reasonable and reasonably necessary for the protection of one or more legitimate interests of the Practice. Provider further acknowledges that Provider has received good and adequate consideration to support said liquidated damages provisions, which are a fundamental part of the Practice's willingness to employ Provider and enter into this Agreement.

(b) <u>Termination by Practice with Cause</u>. Practice shall have the right to terminate this Agreement and discharge Provider with cause, at any time. For purposes of this Section, the term "with cause" shall mean:

    i. <u>Breach of Contract</u>. Failure by Provider to perform the duties hereunder in the manner and to the extent required under this Agreement; or breach by Provider of any of the covenants by Provider set forth in this Agreement; or breach by Provider of any other obligation owed by Provider to Practice under this Agreement;

    ii. <u>Misconduct by Provider</u>. Conduct by Provider that amounts to fraud, dishonesty, moral turpitude, gross negligence, insolence, insubordination, or willful misconduct in the performance of the duties hereunder, or in Provider's relationship with Practice, its employees, or patients;

    iii. <u>Sexual Harassment</u>. Conduct by Provider that amounts to sexual harassment of a patient or employee of Practice or other conduct constituting an inappropriate sexual advance towards a patient or staff member of Provider;

    iv. <u>Discrimination</u>. Conduct by Provider that constitutes willful or unlawful discrimination against an employee or patient of Practice, or any employee working at any hospital or other facility in which Provider has been assigned to work, because of such person's age, sex, race, religion, national origin, or medical condition;

    v. <u>Felonies or Crimes</u>. Provider's being charged with or convicted of a felony of any kind, of a crime involving moral turpitude, of habitual intoxication or addiction to alcohol, narcotics, or illegal substances;

    vi. <u>Drug or Alcohol Abuse</u>. Provider's refusal to take, or failure to pass, any drug test required by Practice at reasonable times and intervals; or conduct by Provider that evidences which, in the Practice's discretion, provides evidence of drug or alcohol abuse which imperils Provider's relationship with Practice, its employees, or patients;

    vii. <u>Obstruction to Patient's Access to Medical Care:</u> Practice has the highest demand for appointments between 4 PM to 6 PM. Access to medical care during this time is crucial. Any act by provider which prevents patients from having appointments during this time and preventing patient's access to medical care.

    viii. <u>Loss of License</u>. Loss of Provider's license to practice medicine in the State of Georgia, or restriction of Provider's right to practice medicine so that Provider cannot engage in the professional services for which Provider was employed;

ix. <u>Uninsurability for Professional Liability Insurance</u>. The uninsurability of Provider for professional liability insurance at the normal or customary rates;

x. <u>Violation of Policy</u>. Violation by Provider of any written policy, standard, procedure, directive, or protocol as established from time to time by the President, or Provider's failure to abide by the instruction or directives of the President, insubordination;

xi. <u>Violation of HIPAA Requirements</u>. Use or disclosure by Provider of private health information in violation of HIPAA Requirements or any other violation of HIPAA requirements;

xii. <u>Negative Work Habits</u>. Conduct by Provider that constitutes negative work habits, including without limitation, Provider's inability to effectively and politely manage patients, failure to comply with utilization standards, failure to work sufficient hours, failure to comply with the work schedule, failure to complete medical records and charts, poor work ethic, poor productivity on the behalf of Provider and subversive behavior (but only after written notice is given to Provider of any such failure and Provider is given a reasonable opportunity to cure such failures (not to exceed fifteen days);

xiii. <u>Fitness to Practice</u>. At the determination by Practice that Provider is unfit to practice medicine in the medical areas for which Provider has been employed by Practice;

xiv. <u>Call Participation</u>. Not participating in on-call schedule as directed by the Practice for any reason or pretext;

xv. <u>Practice Locations</u>. Provider's inability or unwillingness to work in all Practice locations for any reason what so ever;

xvi. <u>Work Schedule</u>. Provider's inability or unwillingness to follow work schedule and duties as stated in this Agreement for any reason what so ever;

(C) <u>Termination by Practice without Cause:</u> Practice shall have the right to terminate this Agreement and discharge Provider without cause, at any time, upon one hundred and Twenty (120) days written notice to Provider. If the practice fails to give minimum hundred and twenty (120) days' notice, then the provider shall be compensated equal to the total of four months of provider's average monthly salary, 12 months preceding the last day of the employment.

If the practice terminates provider's employment without cause before four years term of the contract, the practice will pay equal to 40% of the compensation received by the providers in the preceding 12 months from the last day of the employment. This percentage of total payment amount will go down by 5% for every full employment year completed by the provider. ( 40% year one, 35% year two, 30% year three and 25% of year four).

8. <u>NON-COMPETITION AND NON-SOLICITATION OF PATIENTS AND EMPLOYEES</u>

(a) <u>Definitions.</u>  For purposes of this Section of this Agreement, the following terms shall have the following meanings:

    i.  "<u>Competing Business</u>" means any Person engaged in or conducting a business similar to the Practice's Business anywhere in the applicable Territory. The Practice's Business is providing medical services to **pediatric patients, ages from birth to 18 years , and in an outpatient clinic setting.**

    ii.  "<u>Confidential Information</u>" means data or information, other than Trade Secrets, which is of value to the Practice and not generally known to Persons who engage in or conduct businesses substantially the same as the Practice's Business, including, without limitation, information relating to (a) the Practice's patient or client list, (b) the Practice's computer programs (including enhancements, uses and other manipulations), business plans (including plans for new or enhanced services), fee lists, training manuals and operating plans, and (c) the terms and conditions of engagements or contracts between the Practice and third parties (and the identity of such third parties).  Notwithstanding anything to the contrary provided herein, the term "Confidential Information" shall not include information which is in the public domain.

    iii.  "<u>Practice's Business</u>" means engaging in the practice of medicine in the medical specialty of pediatric care as such services are normally provided by such medical practices to its patients.

    iv.  "<u>Person</u>" means any individual, corporation, bank, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization or any other entity, or any governmental or quasi-governmental unit, or any agency or instrumentality thereof.

    v.  "<u>Territory</u>" means the area within a twenty five miles (as the crow flies) radius from any of the Practice's Georgia office locations, currently: (a) 140 Three Rivers Drive, Rome, Georgia 30161, (b) 114 Plantation Avenue, Cedartown, Georgia 30125, (c) 962 Joe Frank Harris Pkwy, Cartersville, Georgia 30120, (d) 14160 U.S. 27, Trion, Georgia 30753.

    vi.  "<u>Trade Secrets</u>" includes information such as (a) lists of actual or potential patients, (b) lists of suppliers, and (c) any and all non-technical and technical information, designs, know-how, knowledge, data, specifications, test results, computer programs, procedures, formulas, techniques, financial statements, projections and other financial data and other proprietary information of the Practice, whether or not patentable or subject to copyright, which is used by and known only to (a) the Practice; (b) those of its employees to whom it has confided in order to achieve its intended use; (c) any third party to whom the Practice has licensed or disclosed such Trade Secrets on a confidential basis; or (d) third parties hired to develop such Trade Secrets on behalf of the Practice.  Any information that may fall into one of the categories above should be assumed to be a trade secret until conclusively proven otherwise.

vii. "Patients of the Practice" means any Person to whom the Practice has provided services in the Practice's Business with whom Provider established and/or nurtured a patient relationship or with whom Provider had contact and performed services while an employee of the Corporation.

(b) Non-Competition. Provider agrees that during the term of this Agreement and for a period of two years after termination or expiration of this Agreement, Provider will not, without the prior written consent of the Practice, within the Territory, either directly or indirectly, on Provider's own behalf or in the service or on behalf of any other Person as a contractor, locum, partner, joint ventures, consultant, employee or otherwise engage in any Competing Business **as a Medical Provider (NP, PA, MD, or DO).** Provider acknowledges that the foregoing restrictive covenant is necessary to protect one or more legitimate business interests of the Practice. The practice has designed the non-compete clause in such way that it keeps several options open for high quality healthcare jobs for the provider. Any job which is prevented by this non-compete must meet **all three** criteria: 1) Outpatient settings, 2) Pediatric age group (birth to 18 years age), And 3) Working as a medical provider (NP, PA, MD or DO). If the job does not meet even one criteria, that job is not restricted. Since this non-compete clause is very limited and only prevents provider from accepting a very small percentage of total health care jobs, the provider has several options of accepting high quality jobs in the health care industry, even within the restricted territory. For example, including but not limited to working in :1) Any hospital as a medical provider, administrator, nursing or other clinical staff , 2) Any inpatient medical care facilities, 3) Any long term care facilities, 4) Any administrative and non-clinical or leadership job with Government's Department of Health, 5) Any medical director, quality control , medical review officer job for both public and private health insurance companies, 6) Any nursing home job, 7) Any Tele-Medicine job,  8) Any travel nurse/medical provider job, 9) Any outpatient job in every single medical specialty, except pediatrics, 10) Any teaching and academic job in medical or nursing schools, 11) Any nonprofit medical organization that does not provide Pediatric care and many more.

(c) Non-Disclosure. Provider agrees that all records, notes, files, data, memoranda, surveys, contracts, reports, business plans, financial statements, fee schedules, supplier lists, patient lists, contracts, agreements, designs, drawings, plans, sketches, software, documents, equipment, apparatus and like items and all copies thereof (whether written, printed, magnetic, electronic or otherwise) relating to the Practice's Business, Confidential Information or Trade Secrets, which are prepared by Provider or which are disclosed to Provider or which come into Provider's possession, shall be and remain the sole and exclusive property of the Practice. Provider acknowledges that the foregoing restrictive covenant is necessary to protect one or more legitimate business interests of the Practice.

(d) Patient Non-Solicitation. Provider agrees that during the term of this Agreement and for a period of three years after termination or expiration this Agreement, Provider will not, without the prior written consent of the Practice, directly or indirectly, alone or with others, on Provider's own behalf or in the service or on behalf of any other Person solicit, divert, or appropriate, or attempt to solicit, divert or appropriate, to any Competing Business any Patients of the Practice. Provider acknowledges that the foregoing restrictive covenant is necessary to protect one or more legitimate business interests of the Practice.

10

(e) Employee Non-Solicitation. Provider agrees that during the term of this Agreement and for a period of three years after termination or expiration this Agreement, Provider will not, either directly or indirectly, on Provider's own behalf or in the service or on behalf of any other Person, solicit, divert or hire away, or attempt to solicit, divert or hire away, to any Competing Business any person employed by the Practice. Provider acknowledges that the foregoing restrictive covenant is necessary to protect one or more legitimate business interests of the Practice.

(f) Relief from Application of Section 8 Covenants. Provider agrees that a violation of any of the Non-Compete, Non-Disclosure, or the Non-Solicitation restrictive covenants in this Section 8 of this Agreement by a Provider is likely to cause damage to the Practice, in the form of both direct financial damage and reputational damage with financial implications. Provider agrees that such damage is difficult to pre-estimate. The parties hereto agree that Provider may be relieved from the restrictive covenants in Section 8 of this Agreement upon payment of Ninety Nine Thousand Dollars ($99,000.00) to the Practice, which each of the parties hereto agree constitutes liquidated damages and a reasonable estimate of the damages to be suffered by the Practice in the event of a breach by a Provider of any of the restrictive covenant provisions of this Section 8 and is not a penalty. The parties further agree that the damages to be suffered by the Practice in the event of a breach by Provider provisions of this Section 8 may be irreparable or impossible of ascertainment, and that, in the event of a violation or threatened violation of the same, the Practice shall, as a matter of course, be entitled to an injunction (including a temporary restraining order, preliminary injunction, and permanent injunction) issued by any court of competent jurisdiction. The Practice's right to an injunction shall be cumulative to any other remedies the Practice may have, including the right of the Practice to recover damages from Provider. The parties further agree that in any successful action to enforce the provisions of this Section 8, Practice shall be entitled to recover its reasonable attorney fees and expenses of litigation incurred in any enforcement action or activity plus 1.89 percent per month interest on that amount.

(g) Severability. Each of the foregoing subsections is separate and constitutes independent covenants, and any provision of this Section of this Agreement that may be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceable without invalidating the remaining covenants or provisions set forth in the other subsections. Any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(h) Enforceability. To the extent permitted by law, the parties hereby waive any provision of law that renders any provision of this Agreement prohibited or unenforceable in any respect. In addition, in the event of any such prohibition or unenforceability, the parties agree that it is their intention and agreement that any such provision which is held or determined to be prohibited or unenforceable, as written, in any jurisdiction shall nonetheless be in force and binding to the fullest extent permitted by the law of such jurisdiction as though such provision had been written in such a manner and to such an extent as to be enforceable therein under the circumstances. Without limitation of the foregoing, with respect to any restrictive covenant contained herein, if it is determined that any such provision is excessive as to duration or scope, it is intended that it nonetheless be enforced for such shorter duration or with such narrower scope as will render it enforceable.

(i) Acknowledgments. Provider acknowledges that the Practice has a legitimate interest in protecting its Confidential Information, Trade Secrets, the Practice's Business, and the Practice's

11

employee base, which Provider may have the ability to access or affect during and after the course of Provider's employment with the Practice. Provider has participated in the negotiations of, and has read and considered, the foregoing restrictive provisions and agrees that such restrictions (including without limitation the territory, time and prohibited activities covered thereby and the liquidated damages) are fair, reasonable and reasonably necessary for the protection of one or more legitimate interests of the Practice and that such restrictions do not prohibit Provider from otherwise obtaining gainful employment. Provider further acknowledges that Provider has received good and adequate consideration to support said restrictions, which are a fundamental part of the Practice's willingness to employ Provider and enter into this Agreement.

(j) _Territory Reasonable_. Provider explicitly agrees that the thirty-mile radius Territory mentioned in this Section is fair and reasonable. In that connection, Provider agrees that patients routinely and easily travel over thirty miles to see a Pediatric provider in the rural/semi-rural/ non-metro settings in which the Practice offices are located. Provider also agrees that patients routinely and easily travel and cross the county boundary lines to see a Pediatric provider. Provider explicitly agrees that the Territory does not infringe on Provider's ability to find reasonable and meaningful employment or livelihood, and Provider can find a meaningful employment outside the Territory without undue hardship. Provider explicitly agrees that the Territory is not excessive or overly-restrictive and is fair and practical.

(k) _Time Period Reasonable_. Provider explicitly agrees that the two-year "Non-Competition" time period mentioned in this Section is not excessive or overly-restrictive and is fair and practical.

(l) _Notification_. In order to ensure that Provider complies with the non-competition covenants in this Agreement, Provider explicitly agrees to notify Practice: (i) as soon as practicable after accepting any employment during the three-year period after ending employment with the Practice, by providing the Practice with the name and address of Provider's new employment, and (ii) as soon as practicable whenever Provider's home address changes during the two-year period after ending employment with the Practice.

(m) _Survival._ The provisions of this Section of this Agreement shall survive the termination or expiration of this Agreement, irrespective of the reason therefor.

9. MISCELLANEOUS.

(a) _Construction_. The validity and construction of this Agreement or of any of its provisions shall be determined under the laws of the State of Georgia. This Agreement is the joint product of the efforts of both parties hereto, and therefore shall not be construed against one party or the other.

(b) _Entire Agreement_. This Agreement contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them. No modification or addition hereto or waiver or cancellation or any provision shall be valid except by a writing signed by the party charged therewith.

(c) _Notices_. All notices and communications hereunder shall be in writing and shall be deemed given when sent by registered or certified United States mail, postage prepaid, as follows:

12

If to the Practice, address to: Raj Miniyar, MD, 140 Three Rivers Drive, Rome, Georgia 30161

If to Provider, address to: _95 CR 1016 Cedar Bluff, AL 35959_

Any change in address shall be provided to the other party in writing as soon as reasonably practicable, but in any event within five days of the change in address.

(d) Severability. If any provision of this Agreement is held to be invalid or unenforceable, the other provisions of this Agreement shall not be affected thereby to the extent that the overall intent and purposes of this Agreement are not otherwise impaired, but shall be applied as if the invalid or unenforceable provision had not been included in this Agreement.

(e) Waiver of Breach. The waiver by the Practice of a breach of any provision of this Agreement by Provider shall not operate or be construed as a waiver of any other breach of the same provision or any other provision.

(f) Captions. The captions are included herein as a matter of convenience and shall not alter the interpretation of any of the provisions hereof.

(g) Execution. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original.

(h) Acknowledgment. The parties hereto acknowledge that they have read this Agreement, understand it, and agree to be bound by its terms. The parties further acknowledge this Agreement to be the full and complete understanding between them regarding the terms and conditions of the employment established hereunder, superseding any and all communications, proposals or contracts, whether oral or written. The parties each have had the opportunity and the financial means to retain independent counsel to review this Agreement on their behalf.

(i) Governing Law; Venue. This Agreement shall be deemed to have been made in and shall be governed by the laws of the State of Georgia. Any action arising out of or relating to this Agreement shall be brought in the state or federal court located in Rome, Georgia.

(j) Attorney Fees. In the event of any breach or threatened breach of this Agreement by either party, if the non-breaching party should employ attorneys or incur other expenses for the enforcement of any provision herein or any obligation or agreement of the breaching party contained herein, the breaching party agrees that, on demand and to the extent permitted by law, the breaching party shall reimburse the non-breaching party for its reasonable attorney's fees and other such expenses so incurred plus 1.89 percent per month interest on that amount.

The parties hereto have hereunto set their hands and affixed their seals as of the day and year first above written.

SIGNATURES APPEAR ON THE NEXT PAGE

13

PRACTICE: DR. MINYAR'S PEDIATRICS, P.C.

BY: _____
                    PRESIDENT

DATE: _____ 10 - 03 - 2023

PROVIDER:

PRINT NAME: Corie Mitchell

SIGNATURE: Corie Mitchell

DATE: 9-15-2023

Notary Statement:

State of: _____ AL _____ County of ___ Cherokee ____

Signed before me on __ 9 | 15 | 2023 __ (date) by __ Corie Mitchell __

Signature of notarial officer __ Stephanie Pope __

Title of office _____

My commission expires: __ 4 | 26 | 2025 __

Stamp:



STEPHANIE POPE
MY COMMISSION EXPIRES
APRIL 26, 2025
NOTARY PUBLIC
STATE OF ALABAMA

14

# Exhibit 2 to the Affidavit of Dr. Raj Miniyar

## *(Statement of Michelle Piazza)*

**Date of Statement:** July 29, 2025

I, Michelle Piazza, am a Certified Clinical Medical Assistant employed at Dr. Miniyar's Pediatrics in Trion, Georgia. I am writing this statement to detail my personal experiences and observations regarding Ms. Corie Mitchell's conduct in the workplace. Since April 2025 and continuing through the present, I have observed ongoing behavioral issues and disruptions involving Nurse Practitioner Corie Mitchell.

Initially, I observed Ms. Mitchell to be respectful. I have previously worked with her in a prior employment, where I served as her nurse, and was familiar with her professional habits. Early on during her time covering at our Trion office while our administrator, Miss Veronica, was on maternity leave, Ms. Mitchell received a directive from Dr. Miniyar to work in the back office following a complaint from a back-office nurse. Ms. Mitchell expressed frustration about the complaint and made a comment that the nurse "needed to stop calling Dr. Miniyar for the stupidest things." She also began recording notes in a brown notebook—a practice I was familiar with from our previous employment together.

Ms. Mitchell developed a close working relationship with a back-office nurse, and together, they would make negative remarks about other staff members and providers, which contributed to tension among the team. Ms. Mitchell would make comments that she "stands up for the nurses" and "never throws them under the bus." However, when Miss Veronica returned from maternity leave in mid-April, Ms. Mitchell's negative behavior shifted to her. She began working only on Wednesdays at Trion location and was often critical of Miss Veronica. She claimed she would be promoted to office administrator and that Miss Veronica was not supportive of the nursing staff.

When at the Trion office, Ms. Mitchell would regularly sit in Room 15 during work hours, watching movies on her phone or streaming the Weather Channel on her work laptop. On multiple occasions, she responded dismissively to Miss Veronica's instructions and rolled her eyes in response. Around late May, she began informing staff and patients that she would be starting a weight-loss clinic on June 1, 2025, and administering injections to patients in the Rome and Trion locations—while another nurse practitioner would oversee Cartersville and Cedartown locations. This raised concern for me personally because, based on my research and understanding, the medication was not FDA-approved for pediatric weight loss only or sufficiently researched for patients under 18 years old. Miss Veronica and Dr. Anderson expressed concerns about this. Dr. Anderson brought her concerns to Dr. Miniyar, who informed Ms. Mitchell that the clinic would not proceed. Ms. Mitchell then attributed blame to Dr. Anderson and Miss Veronica, stating they should "mind their own business." Since that event, she has declined to speak to either of them.

Over the past month, I have observed Ms. Mitchell working on a children's book at the back workstation during clinic hours. She often appears to monitor staff conversations and has contributed to a divisive and uncomfortable work atmosphere. During all this, she continues to write in her brown book. One particular incident made me feel as though I was being held responsible for an issue that directly resulted from Ms. Mitchell's actions. Ms. Mitchell had called the parent of a patient scheduled for later in the day and requested that they reschedule, citing a desire to leave early. This patient was a follow-up for a urinary tract infection. After she contacted the parent, she instructed me to move the appointment to the following Tuesday. Ms. Mitchell at the time, only worked Wednesday and would cover other days as needed. When Miss Veronica later asked about the change, I informed her that Ms. Mitchell had requested it. As per protocol, rescheduling patients—especially without medical necessity—should only be approved by administration.

Following the resignation of a back-office nurse, Ms. Mitchell approached me and stated, "So I hear your best friend quit — did you do it?" I responded that it was not my business and that I had no knowledge of the situation. The following week, I needed to speak with Ms. Mitchell regarding patient medications that had not been charted or sent. When I approached her workstation, I saw that she was completing a job application. She smiled and said, "Oh, did you see that?" I commented that I was unaware her contract was ending, and she smiled again but did not respond. More recently, I was informed on July 23rd that Ms. Mitchell contacted Dr. Miniyar regarding my and Miss Veronica behavior towards her. From my understanding, Miss Veronica and I were being labeled as "bullies" and going to lunch together to plot her demise. These allegations are completely false and do not reflect my character or conduct as a professional. Even after making these allegations, Ms. Mitchell has continued to contact me on both my personal and work phones to discuss matters unrelated to work, most recently on July 28, 2025. During that conversation, she repeatedly referred to me as 'friend,' which felt inconsistent with the nature of her recent accusations.

The atmosphere in the office on days when Ms. Mitchell is present has become tense and difficult. Several staff members express anxiety and feel as though they are being monitored or written about in her book. At one point, Dr. Miniyar held a meeting with all staff, during which all Trion providers were present. Dr. Miniyar addressed the ongoing issues and encouraged everyone to maintain professionalism and mutual respect. He also emphasized that disciplinary action would be taken against any staff member who failed to comply with office policies.

Despite the challenges, I have maintained a professional relationship with Ms. Mitchell. When she assigns tasks, I complete them to the same standard I would for any other provider. I remain committed to supporting the office and fulfilling my responsibilities

impartially. Finally, I want to note that Ms. Mitchell has made disparaging comments about me to others, including a job shadowing candidate, implying that I "scare employees away" and create a hostile work environment. These comments were upsetting and made me feel targeted and undervalued, despite my consistent efforts to maintain professionalism and fulfill my role effectively.

I submit this statement voluntarily and confirm that the above information is accurate to the best of my knowledge.

Signature: _Michelle Hazza_  Date: _July 29th, 2025_

# Exhibit 3 to the Affidavit of Dr. Raj Miniyar

## *(Statement of Veronica Ortiz)*

My name is Veronica Ortiz. I am the Lead Clinic Administrator and Pediatric Nurse Practitioner at Dr. Miniyar's Pediatrics in Trion, Georgia. My professional interactions with Corie Mitchell prior to April 2025 were limited. Upon returning from maternity leave on April 15, 2025, I was approached by multiple staff members regarding concerns related to Mrs. Mitchell's behavior in the workplace. In my role as Clinical Administrator, one of my responsibilities includes addressing interpersonal conflicts and maintaining a professional and respectful work environment. Several staff members shared concerns that included, but were not limited to, being referred to as a "snitch" by Mrs. Mitchell after communicating an incident to Dr. Miniyar, and describing Mrs. Mitchell as "acting like a mean girl". I began to monitor the situation closely and, over time, noticed that the frequency and intensity of Mrs. Mitchell's comments and negative behavior increased.

It appeared this escalation coincided with the discontinuation of Mrs. Mitchell's proposed weight loss clinic. Following that decision, I observed what I perceived to be a shift in Mrs. Mitchell's behavior, particularly toward myself and Dr. Judith Anderson, the pediatrician at the Trion location. I was informed by Wajiha Farooq, a Physician Assistant from the Rome office, that Mrs. Mitchell's was openly expressing dissatisfaction with the weight loss clinic cancellation and making negative remarks. During this time, multiple staff members began to share that they felt Mrs. Mitchell was instigating issues and creating division among the clinical team. One nurse also shared with me that Mrs. Mitchell had "bragged" to her about making another provider in the Rome office cry, which was deeply concerning to hear. I found it necessary to take further steps in alignment with my administrative responsibilities and reached out to Amy Jones, a member of the administration team. A meeting was arranged with Dr. Miniyar, which took place on June 13, 2025. Following that meeting, Dr. Miniyar met with all Trion staff members, including Mrs. Mitchell and Dr. Anderson, on June 18, 2025. During the meeting, Dr. Miniyar emphasized the importance of professionalism, respectful communication, and a collaborative work environment. He also clarified the roles and responsibilities of the clinic administrator. Staff were given an opportunity to express their concerns and ask questions.

After the staff meeting, I felt that Mrs. Mitchell's behavior toward me worsened. I perceived her actions as retaliatory. I made every effort to maintain professional boundaries, but over time, I found it increasingly difficult. As a result, I limited my communication with Mrs. Mitchell to only what was necessary to ensure quality patient care. Due to the growing concerns for my ability to fulfill my responsibilities in what I perceived as a hostile work environment, I requested to switch my scheduled Saturday shift on July 16, 2025, with another provider. This was prompted by the fact that I was originally scheduled to work alongside Mrs. Mitchell that day. Around July 24th, 2025, I was informed by a staff member, Leisha Malone, that Mrs. Mitchell had made a comment stating it would not be long before she took over the administrator role. Mrs. Mitchell had previously expressed interest in joining the administrative team to staff members at both the Rome and Trion office. Mrs. Mitchell openly mentioned keeping a record or

"little book" of workplace incidents. This behavior contributed to an atmosphere of discomfort among the team, as several staff members expressed concern that the documentation could be used against them if they did not comply with Mrs. Mitchell's expectations or were not perceived as "good" by her. Staff members also expressed to me that they felt Mrs. Mitchell was attempting to turn others against me. In light of these developments, I encouraged staff to bring any concerns directly to me and reassured them that, if needed, they could escalate concerns to Dr. Miniyar or Amy Jones.

To this day, in every encounter I have with Mrs. Mitchell, I make a conscious effort to remain professional, maintain respectful communication, and focus solely on patient care and collaborative teamwork. In my observation, Mrs. Mitchell's behavior has had a detrimental impact on the practice's workflow and team dynamics. Any allegations suggesting that I have engaged in bullying are not accurate. I categorically deny such claims and stand firmly by the accuracy and integrity of the statements provided above.

Veronica Ortiz
Lead Clinical Administrator & Pediatric Nurse Practitioner
Dr. Miniyar's Pediatrics, Trion, Georgia.

Date: 07/28/25

# Exhibit 4 to the Affidavit of Dr. Raj Miniyar

## *(Statement of Mercedes Miller)*

## Parent Statement Regarding July 29, 2025 Visit

**Patient Name:** ▓▓▓▓▓▓▓▓▓

**Parent/Guardian Name:** _Mercedes Miller_

**Date of Visit:** July 29, 2025

**Location:** Dr. Miniyar's Pediatrics, P.C. – Trion

I, the undersigned parent/guardian, confirm that during my visit to the clinic on **July 29, 2025**, Nurse Practitioner **Corie Mitchell** made the following statements and took the following actions:

1. She told me that **"something horrible" had been done by the clinic** to my child, ▓▓▓▓▓▓▓ even though ▓▓▓▓▓ **was not at the clinic at the time.**

2. Ms. Mitchell specifically asked me to **go home and bring** ▓▓▓▓▓ **back to the clinic** for evaluation. Once I returned with her, Ms. Mitchell created an **on-the-spot appointment** and opened a **new medical chart**, despite the fact that ▓▓▓▓▓ **had no medical complaint or symptoms that day.**

3. She strongly urged me to **call a lawyer and provided the number "1-800-LAWYER,"** encouraging me to sue the practice and its staff.

4. The medication in question (Fluticasone and Zyrtec) had been prescribed **nearly two and a half months prior**, and my child had shown **no side effects, symptoms, or harm** since then. There was no clinical concern present on the date of this visit.

These statements caused me significant emotional distress and fear. I am signing this statement to confirm the facts of what occurred during that visit.

**Signature of Parent/Guardian:** _____

**Date:** _08/07/25_____